JS - 6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| Del Monte International GmbH, | ) ) ) | CV 13-5912 RSWL (MANx) |
| Plaintiff, | ) ) | **Order re: Defendant's** |
| v. | ) ) | **Motion to Dismiss Pursuant to Fed. R. Civ.** |
| Del Monte Corporation, | ) ) | **P. 12(b)(1) and 12(b)(6)** |
| | ) ) | **[17]** |
| Defendant. | ) ) ) ) ) ) ) ) | |

Currently before the Court is Defendant Del Monte Corporation's ("Defendant") Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [17]. Plaintiff Del Monte International GmbH ("Plaintiff") filed its Opposition on November 6, 2013 [21]. Defendant filed its Reply on November 20, 2013 [22]. This matter was taken under submission on November 26, 2013 [23].  Having reviewed all papers submitted pertaining to the Motion, and having considered all

1

arguments presented to the Court, the Court **NOW FINDS AND RULES AS FOLLOWS:**

Defendant's Motion to Dismiss is hereby **GRANTED.**

## I.   Background

Plaintiff is a limited liability company organized under the laws of Switzerland, with its principal place of business in Monaco.  Compl. ¶ 2.  Plaintiff is a wholly owned subsidiary of Fresh Del Monte Produce Inc. ("Fresh Del Monte"), the holding company for the Del Monte Fresh Produce group of companies.  <u>Id.</u> at ¶ 3. Defendant is a Delaware corporation with its principal executive offices in California.  <u>Id.</u> at ¶ 4.

Before August 1989, Defendant was a wholly owned subsidiary of RJR Nabisco, Inc. and was divided into two major operations.  <u>Id.</u> at ¶ 12.  One operation was dedicated to selling canned fruits and vegetables and dried fruits; the other operation principally sold fresh fruits, fresh vegetables, fresh produce, and certain preserved products.  <u>Id.</u>  In late 1989, the second operation was sold to Polly Peck International and ultimately became part of Fresh Del Monte.  <u>Id.</u>

Fresh Del Monte is a leading producer and seller of high-quality fresh fruit and vegetables, as well as a leading producer and distributor of prepared fruit and vegetables, juices, beverages, snacks, and desserts in Europe, the Middle East, Africa, and former Soviet Union countries.  <u>Id.</u> at ¶ 13.  Fresh Del Monte provides its services and products to customers in over

2

1  80 countries worldwide.  <u>Id.</u>  Fresh Del Monte has
2  leading market positions in many product categories,
3  all of which are sold under the DEL MONTE trademark.
4  <u>Id.</u> at ¶ 14.  Fresh Del Monte generated approximately
5  $2,664,166,000 in net sales from its DEL MONTE branded
6  products in fiscal year 2012.  <u>Id.</u>

7       Plaintiff owns the trademark DEL MONTE in South
8  Africa and has owned the Mark there since 1990.  <u>Id.</u> at
9  ¶ 16.  Plaintiff also holds: (1) an exclusive,
10 perpetual, royalty-free worldwide license to use the
11 DEL MONTE Mark on or in connection with the production,
12 manufacture, sale, and distribution of fresh fruit,
13 vegetables, and produce, and certain preserved fruit
14 products; and (2) an exclusive, royalty-free license to
15 use the DEL MONTE Mark on or in connection with
16 production, manufacture, sale, and distribution of all
17 food products in Europe, the Middle East, Africa, and
18 former Soviet Union countries.  <u>Id.</u> at ¶ 17.

19      Plaintiff and its affiliates have owned and
20 operated over a dozen "delmonte" domain names for over
21 a decade without seeking or receiving authorization
22 from Defendant.  <u>Id.</u> at ¶ 19.  Defendant has never
23 objected to any of these domain names.  <u>Id.</u>

24      In June 2011, the Internet Corporation for Assigned
25 Names and Numbers ("ICANN") introduced its New Generic
26 Top Level Domain Program, which allows parties to apply
27 for new generic top level domains ("gTLD"), unique top
28 level domains ("TLD"), to be used in lieu of

traditional TLDs, such as <.com> or <.net>.  Id. at ¶ 20.  The application window opened on January 12, 2012, and closed on May 30, 2012.  Id. at ¶ 21.

ICANN also provided for a New gTLD Dispute Resolution Procedure and authority for administering this procedure was delegated to the World Intellectual Property Organization ("WIPO").  Id. at ¶ 22.  WIPO subsequently adopted the WIPO Rules for New gTLD Dispute Resolution for Legal Rights Objections.  Id. Under these policies and rules, third parties were allowed to challenge a gTLD application by filing a Legal Rights Objection ("LRO") during a specified period.  Id. at ¶ 23.  The principal inquiries pertaining to applications for gTLDs that are also trademarks are (1) whether the applicant has bona fide rights in the trademark that corresponds to the applied-for gLTD and (2) whether registration of the gTLD by the applicant would create an impermissible likelihood of consumer confusion.  Id. at ¶ 24.

Plaintiff submitted its Application for the gTLD <.delmonte> during the specified period.  Id. at ¶ 25. On March 1, 2013, Defendant filed an LRO objecting to Plaintiff's Application.  Id. at ¶ 31.  On June 14, 2013, WIPO appointed a three-member panel to decide, based on its determination as to the principal inquiries pertaining to gTLDs, whether to uphold or reject Defendant's LRO.  Id. at ¶ 35.  On August 6, 2013, a majority of the WIPO panel decided in favor of

1  sustaining Defendant's LRO.  <u>Id.</u> at ¶ 36.

2      On August 13, 2013, Plaintiff filed this Action in

3  this Court, requesting a declaration that: (1)

4  Plaintiff has *bona fide* rights in the DEL MONTE Mark;

5  (2) that Plaintiff is not in violation of the Anti-

6  Cybersquatting Consumer Protection Act ("ACPA"), 15

7  U.S.C. § 1125(d); and (3) Plaintiff's registration of

8  the gTLD <.delmonte> will not create an impermissible

9  likelihood of confusion.  Plaintiff also requests that

10 this Court order Defendant to withdraw its LRO.  <u>Id.</u> at

11 ¶ 42.

12               **II.  Legal Standard**

13 **A.  <u>Motion to Dismiss Pursuant to Rule 12(b)(1)</u>**

14      Federal Rule of Civil Procedure 12(b)(1) authorizes

15 a court to dismiss claims over which it lacks proper

16 subject matter jurisdiction.  A court is free to

17 determine jurisdiction on a motion to dismiss for lack

18 of jurisdiction under Rule 12(b)(1) "unless the

19 jurisdictional issue is inextricable from the merits of

20 a case."  <u>Kingman Reef Atoll Invs., L.L.C. v. United</u>

21 <u>States</u>, 541 F.3d 1189, 1195 (9th Cir. 2008) (citing

22 <u>Roberts v. Corrothers</u>, 812 F.2d 1173, 1177 (9th Cir.

23 1987)).

24      "[U]nlike a Rule 12(b)(6) motion, in a Rule

25 12(b)(1) motion, the district court is not confined to

26 the four corners of the complaint -- it may consider

27 facts and need not assume the truthfulness of the

28 complaint[,]" and the existence of disputed material

1  facts will not preclude the court from evaluating the

2  existence of subject matter jurisdiction.

3  Americopters, LLC v. Fed. Aviation Admin., 441 F.3d

4  726, 732 n.4 (9th Cir. 2006); see also Ass'n of Am.

5  Med. Colls. v. United States, 217 F.3d 770, 778 (9th

6  Cir. 2000).  The moving party "should prevail [on a

7  motion to dismiss] only if the material jurisdictional

8  facts are not in dispute and the moving party is

9  entitled to prevail as a matter of law." Casumpang v.

10  Int'l Longshoremen's & Warehousemen's Union, 269 F.3d

11  1042, 1060-61 (9th Cir. 2001) (internal citations

12  omitted); Tosco Corp. v. Cmtys. for a Better Env't, 236

13  F.3d 495, 499 (9th Cir. 2001), overruled on other

14  grounds by, Hertz Corp. v. Friend, 559 U.S. 77 (2010).

15  **B.  Motion to Dismiss Pursuant to Rule 12(b)(6)**

16      Federal Rule of Civil Procedure 12(b)(6) allows a

17  party to move for dismissal of one or more claims if

18  the pleading fails to state a claim upon which relief

19  can be granted.  Dismissal can be based on a lack of

20  cognizable legal theory or lack of sufficient facts

21  alleged under a cognizable legal theory.  Balistreri v.

22  Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

23  1990).  However, a party is not required to state the

24  legal basis for its claim, only the facts underlying

25  it.  McCalden v. Cal. Library Ass'n, 955 F.2d 1214,

26  1223 (9th Cir. 1990).  In a Rule 12(b)(6) motion to

27  dismiss, a court must presume all factual allegations

28  of the complaint to be true and draw all reasonable

1  inferences in favor of the non-moving party.  Klarfeld
2  v. United States, 944 F.2d 583, 585 (9th Cir. 1991).

3      The question presented by a motion to dismiss is
4  not whether the plaintiff will prevail in the action,
5  but whether the plaintiff is entitled to offer evidence
6  in support of its claim.  Swierkiewica v. Sorema N.A.,
7  534 U.S. 506, 511 (2002).  "While a complaint attacked
8  by a Rule 12(b)(6) motion to dismiss does not need
9  detailed factual allegations, a plaintiff's obligation
10 to provide the 'grounds' of his 'entitle[ment] to
11 relief' requires more than labels and conclusions, and
12 a formulaic recitation of a cause of action's elements
13 will not do." Bell Atl. Corp. v. Twombly, 550 U.S.
14 544, 555 (2007) (internal citation omitted).  Although
15 specific facts are not necessary if the complaint gives
16 the defendant fair notice of the claim and the grounds
17 upon which the claim rests, a complaint must
18 nevertheless "contain sufficient factual matter,
19 accepted as true, to state a claim to relief that is
20 plausible on its face." Ashcroft v. Iqbal, 556 U.S.
21 662, 678 (2009) (internal quotation marks omitted).

22      If dismissed, a court must then decide whether to
23 grant leave to amend.  The Ninth Circuit has repeatedly
24 held that a district court should grant leave to amend
25 even if no request to amend the pleadings was made,
26 unless it determines that the pleading could not
27 possibly be cured by the allegation of other facts.
28 Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000).

### III.  Discussion

**A.  <u>Subject Matter Jurisdiction</u>**

Plaintiff asserts a claim for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Compl. ¶ 42.  The Declaratory Judgment Act creates a remedy in federal court "[i]n a case of actual controversy within its jurisdiction," and provides that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).

"[T]he phrase 'case of actual controversy' in the [Declaratory Judgment Act] refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."  <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118, 127 (2007) (citing <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 240 (1937)).

Moreover, it is axiomatic that "[t]he Declaratory Judgment Act does not provide an independent jurisdictional basis for suits in federal court." <u>Fiedler v. Clark</u>, 714 F.2d 77, 79 (9th Cir. 1983) (citing <u>Skelly Oil Co. v. Phillips Petroleum Co.</u>, 339 U.S. 667, 671-74 (1950)); <u>see also California Shock Trauma Air Rescue v. State Comp. Ins. Fund</u>, 636 F.3d 538, 543 (9th Cir. 2011).  Indeed "[t]he Declaratory Judgment Act merely creates a remedy in cases otherwise within the court's jurisdiction."  <u>Morongo Band of Mission Indians v. California State Bd. of Equalization</u>, 858 F.2d 1376, 1382-83 (9th Cir. 1988).

"Federal courts are courts of limited jurisdiction." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994).  Accordingly, "the burden of establishing" that a cause lies within the Court's jurisdiction "rests upon the party asserting jurisdiction." <u>Id.</u> (citing <u>McNutt v. Gen. Motors Acceptance Corp.</u>, 298 U.S. 178, 182-83 (1936)).

1.  <u>Request for a Declaration that Plaintiff has Bona Fide Rights in the Mark</u>

"The Ninth Circuit has stated that trademark disputes have sufficiently ripened into an actual controversy under the [Declaratory Judgment Act] when 'the plaintiff has a real and reasonable apprehension that he will be subject to liability.'" <u>Neilmed Prods. v. Med-Systems</u>, 472 F. Supp. 2d 1178, 1180 (N.D. Cal. 2007) (quoting <u>Chesebrough-Pond's v. Faberge</u>, 666 F.2d 393, 396 (9th Cir. 1982)); <u>see also</u> <u>Rhoades v. Avon Prods.</u>, 504 F.3d 1151, 1157 (9th Cir. 2007) (quoting <u>Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.</u>, 896 F.2d 1542, 1555-56 (9th Cir. 1990)) ("[A]n action for a declaratory judgment that a patent [or trademark] is invalid, or that the plaintiff is not infringing, [presents] a case or controversy if the plaintiff has a real and reasonable apprehension that he will be subject to liability if he continues to manufacture his product").

The reasonable apprehension of litigation test need not necessarily be met for an actual controversy to

exist.  Amazon.com, Inc. v. Nat'l Ass'n of Coll.
Stores, Inc., 826 F. Supp. 2d 1242, 1249 (W.D. Wash.
2011) (citing MedImmune, 549 U.S. at 132 n.11).
Instead, to satisfy the case or controversy
requirement, "the dispute [must] be 'definite and
concrete, touching the legal relations of parties
having adverse legal interests'" and it must "be 'real
and substantial' and 'admi[t] of specific relief of a
conclusive character, as distinguished from an opinion
advising what the law would be upon a hypothetical
state of facts.'"  MedImmune, 549 U.S. at 127 (quoting
Aetna, 300 U.S. at 240-41).  Indeed, the "triad of
injury in fact, causation, and redressability comprises
the core of Article III's case-or-controversy
requirement, and the party invoking federal
jurisdiction bears the burden of establishing its
existence."  Steel Co. v. Citizens for a Better Env't,
523 U.S. 83, 103-04 (1998) (citing FW/PBS, Inc. v.
Dallas, 493 U.S. 215, 231 (1990)); see also Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

     Plaintiff and Defendant vigorously disagree over
whether there is a case or controversy over Plaintiff's
bona fide rights in the DEL MONTE Mark.  Defendant, for
example, argues that it has never contested the
validity or scope of Plaintiff's South African
trademark rights.  Mot. 10:2-11; Reply 13:8-14:21.
Defendant further asserts that any such ruling on
Plaintiff's rights would be an improper advisory

opinion.  Mot. 9:8-17.  Plaintiff, on the other hand,
attempts to narrow the issue.  Plaintiff contends that
there is a case or controversy over Plaintiff's bona
fide rights in the DEL MONTE Mark sufficient to allow
it to register the gTLD.  Opp'n 14:12-15:15.
Plaintiff's asserted rights in the DEL MONTE Mark
appear to stem from either Plaintiff's licenses to use
the Mark, or its South African trademark registration.
Id. at 10:7-26; 14:5-9.

     To the extent that Plaintiff requests this Court to
determine the validity of its actions - namely applying
to ICANN for the gTLD <.delmonte> - under its licenses
with Defendant, it is clear that there exists a case or
controversy between the Parties.  There is a case or
controversy if Plaintiff is requesting that this Court
determine its bona fide rights under the DEL MONTE Mark
to apply for the <.delmonte> gTLD.  This is so because
Defendant challenged Plaintiff's gTLD registration on
the ground that Plaintiff's licenses do not confer upon
Plaintiff the right to use the DEL MONTE Mark as a
gTLD.  See Stockton Decl. Ex. E ¶¶ 17-22.  Defendant's
act of filing the LRO caused Plaintiff's injury of not
being awarded <.delmonte>.  A determination as to the
validity of Plaintiff's actions would certainly touch
upon the legal rights of both Parties.  Such a
declaration issued by this Court would settle, at least
to a certain degree, the disputes of the two Parties
with respect to <.delmonte>.  Thus, Plaintiff is

correct to focus on the transaction at hand, not the fact that Defendant has not challenged Plaintiff's other uses of the DEL MONTE Mark in its other domain names.  Opp'n 12:9-13:14.

It appears, then, that there is a case or controversy within the meaning of Article III. However, a crucial question remains: whether federal subject matter jurisdiction lies in this Action.

As a preliminary matter, it is clear that a dispute over the terms or the scope of the license agreements would not arise under the Lanham Act.  See Everest & Jennings, Inc. v. E & J Mfg. Co., 263 F.2d 254, 262 (9th Cir. 1958) ("It has been long the law that actions brought to enforce contracts of which a patent is the subject matter must, in the absence of diversity of citizenship, be brought in the state court . . . The same rule applies to the construction of this section when trade-marks are involved"); see also Saturday Evening Post Co. v. Rumbleseat Press, Inc., 816 F.2d 1191, 1194 (7th Cir. 1987) ("a dispute over the terms of a copyright license is not deemed to arise under the Copyright Act"); Geneva Intern. Corp. v. Petrof, Spol, S.R.O., 608 F. Supp. 2d 993, 998 (N.D. Ill. 2009) ("A license to use a trademark is a contract, and disputes over the language of a trademark license are governed by the rules of contract interpretation").[1]  Federal

_____

[1] "Federal jurisdiction extends only to those cases in which a well-pleaded complaint establishes either

jurisdiction, then, must derive from somewhere else in Plaintiff's Complaint.  In other words, the Court rejects Plaintiff's argument that this Court has jurisdiction arising from Plaintiff's request that this Court interpret its license rights.  <u>See</u> Opp'n 10:8-10.

    2.  <u>Request for Declaration of Compliance With the ACPA - 15 U.S.C. § 1114(2)(D)(v)</u>

Plaintiff's alternative basis for jurisdiction is through its request for a declaration that it is not in violation of the ACPA.  Opp'n 3:4-7; 11:9-11. Plaintiff requests relief in the form of a declaration that it has not violated 15 U.S.C. § 1125(d).  <u>See</u> Compl. ¶ 42; Opp'n 11:9-20, 15:23-19:3.  While Plaintiff styles this particular claim for relief as rising under the Declaratory Judgment Act, functionally it is indistinguishable from a claim under 15 U.S.C. § 1114(2)(D)(v).

---

that [1] federal [trademark] law creates the cause of action or [2] that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal [trademark] law, in that [federal trademark] law is a necessary element of one of the well-pleaded claims."

<u>Duncan v. Tuetzle</u>, 76 F.3d 1480, 1486 (9th Cir. 1996) (internal quotation marks omitted) (quoting <u>Christianson v. Colt Indus. Operating Corp.</u>, 486 U.S. 800, 808 (1988)).

As this portion of Plaintiff's Complaint requires only contractual interpretation, it does not arise under the Lanham Act.

Federal courts have jurisdiction to adjudicate actions arising under the Lanham Act.  See 15 U.S.C. § 1121; 28 U.S.C. § 1338.  Such disputes include actions involving the ACPA.  See Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1195, 1202 (9th Cir. 2012).

Unless Plaintiff's claims are "so attenuated and unsubstantial as to be absolutely devoid of merit," Plaintiff has successfully invoked federal jurisdiction by pleading claims under the ACPA.  Hagans v. Lavine, 415 U.S. 528, 536-37 (1974) (quoting Newburyport Water Co. v. Newburyport, 193 U.S. 561, 579 (1904)); see also Sallen v. Corinthians Licenciamentos LTDA, 273 F.3d 14, 23-24 (2d Cir. 2001).  In other words, unless Plaintiff's ACPA claims are obviously frivolous or plainly insubstantial, this Court has federal jurisdiction.  A claim meets this standard only if it is clearly contradicted by prior decisions so "as to foreclose the subject and leave no room for inference that the questions sought to be raised can be the subject of controversy."  Id. at 538 (quoting Ex parte Poresky, 290 U.S. 30, 32 (1933)).

Neither party cites to any case law applying the ACPA's provisions to gTLDs, such as the one at issue in this case.  Nor could this Court find any.  Rather, Plaintiff argues for an extension of the ACPA to encompass gTLDs assigned via ICANN's new gTLD program. Such an argument is not manifestly frivolous.

14

1    Defendant avers, however, that no case or

2  controversy exists with respect to the ACPA.  <u>See</u> Mot.

3  7:14-15, 7:17-24.  It is insufficient, however, for

4  Defendant merely to represent that it does not intend

5  to sue Plaintiff under the ACPA with respect to its

6  current domain names.  <u>See</u> <u>Sallen</u>, 273 F.3d at 18.  The

7  focus is on whether there is a "definite and concrete"

8  dispute between the parties that is not only "real and

9  substantial," but also "[admits] of specific relief

10  through a decree of a conclusive character."

11  <u>MedImmune</u>, 549 U.S. at 127 (quoting <u>Aetna</u> 300 U.S. at

12  240-41).

13    Assuming that Plaintiff's reading of 15 U.S.C. §

14  1114 is correct, a decree by this Court that

15  Plaintiff's application for <.delmonte> is in

16  compliance with the ACPA would allow this Court to

17  issue injunctive relief, such as by ordering Defendant

18  to withdraw its LRO.  <u>See</u> 15 U.S.C. § 1114(2)(D)(v).

19  Plaintiff surely would be afforded "specific relief . .

20  . of a conclusive character" were this Action to be

21  decided in its favor.  <u>MedImmune</u>, 549 U.S. at 127.

22    Thus, in <u>Sallen v. Corinthians Licenciamentos LTDA</u>,

23  the First Circuit found in a case where the plaintiff

24  invoked 15 U.S.C. § 1114(2)(D)(v) that there was a live

25  controversy where: (1) both parties were still claiming

26  exclusive rights to the same domain name, (2) the

27  domain name had been transferred to the defendant, and

28  (3) the defendant was using the domain name.  273 F.3d

1  at 25-26.   The court also reasoned that there was an

2  actual dispute because a declaration of plaintiff's

3  compliance with the ACPA was relevant not only to

4  defend against a lawsuit under the ACPA, but also to

5  redress plaintiff's loss of his domain name in the

6  prior Uniform Domain-Name Dispute Resolution Policy

7  ("UDRP") proceedings.   <u>Id.</u>

8       The Court holds that Plaintiff is correct in

9  arguing that a case or controversy exists here.   Just

10  as in <u>Sallen</u>, a dispute arose with respect to the

11  Parties' respective rights to a mutually excludable

12  internet domain.   Here, after Plaintiff applied for the

13  gTLD <.delmonte>, Defendant filed an LRO objecting to

14  Plaintiff's gTLD application.   Compl. ¶¶ 25, 31.   And,

15  here, just as in <u>Sallen</u>, a determination was made as to

16  the domain's ownership pursuant to a policy

17  "prohibiting the registration of a domain name that is

18  identical to, confusingly similar to, or dilutive of

19  another's mark."   15 U.S.C. § 1114(2)(D)(ii)(II).   In

20  particular, the WIPO panel sustained Defendant's LRO,

21  thereby denying Plaintiff's registration of

22  <.delmonte>.   Compl. ¶ 36.   Therefore, just as in

23  <u>Sallen</u>, a "certain controversy" exists.   <u>Sallen</u>, 273

24  F.3d at 26.

25       3.   <u>Conclusion</u>

26       Because an actual controversy exists between the

27  Parties and because Plaintiff has pleaded a

28  nonfrivolous claim under the ACPA, this Court holds

16

that it has subject matter jurisdiction over this
Action.

    4.   Discretion to Decline to Exercise Jurisdiction
            Under the Declaratory Judgment Act

     Even if a district court determines that it has
jurisdiction under the Declaratory Judgment Act, it is
still not required to exercise its authority to hear
the case.  Wilton v. Seven Falls Co., 515, U.S. 277,
283 (1995); Huth v. Hartford Ins. Co., 298 F.3d 800,
802 (9th Cir. 2002).  Several factors are relevant in
determining whether to exercise jurisdiction.  For
example, "[a] district court should avoid needless
determination of state law issues; it should discourage
litigants from filing declaratory actions as a means of
forum shopping; and it should avoid duplicative
litigation."  Huth, 298 F.3d at 803 (citing Gov't Emps.
Ins. Co. v. Dizol, 133 F.3d 1220, 1225 (9th Cir.
1998)).  Defendant proposes at least two other factors:
"whether the declaratory action will serve a useful
purpose in clarifying the legal relations at issue,
[and] whether the declaratory action is being sought to
obtain a res judicata advantage."  Mot. 13:14-15
(quoting Williams v. Azzogleads.com, Inc., No. CV 08-
807 AHS (ANx), 2008 WL 4383875, at *1 (C.D. Cal. Sept.
4, 2008) (citations omitted)).

     The Court finds that although exercising
jurisdiction would require it to determine state law
issues with respect to the scope of Plaintiff's

licenses, such issues are necessary to the proper
adjudication of this case.  As such, the Court finds
that the first factor is neutral in determining whether
to exercise jurisdiction.

     The Court finds that the second factor,
discouraging litigants from using declaratory actions
as a means of forum shopping, weighs against exercising
jurisdiction.  In particular, Plaintiffs already have a
means of review available to them: the ICANN request
for reconsideration process.  See Bylaws for Internet
Corporation for Assigned Names and Numbers, Art. IV,
ICANN (Nov. 27, 2013),
https://www.icann.org/en/about/governance/bylaws.
Notwithstanding Plaintiff's assertions that ICANN's
reconsideration process fails to provide adequate due
process (Opp'n 16:23-18:3), Plaintiff still bypassed
the procedures available to it to file this Action.  As
such, the Court finds that this factor weighs against
exercising jurisdiction.

     The next factor, avoiding duplicative litigation,
is neutral.  Neither Plaintiff nor Defendant have
identified any parallel litigation.  Additionally,
because no litigation beyond this Action is
anticipated, the Court finds that this Action does not
appear to be brought to obtain a res judicata
advantage.  Accordingly, the Court finds that this
factor weighs toward exercising jurisdiction.

     The Court finds that the next factor, whether the

declaratory action will help clarify the legal relations between the parties, weighs toward exercising jurisdiction.  In particular, the Action will clarify the legal relationship regarding gTLDs between the Parties with respect to the DEL MONTE Mark.

Because most of the factors either weigh toward or are neutral with respect to exercising jurisdiction over this Action, this Court does not decline to exercise jurisdiction.

**B.  Failure to State a Claim**

Having found that it has jurisdiction over this Action, the Court next must determine whether Plaintiff has stated a claim sufficient to survive Defendant's Rule 12(b)(6) Motion to Dismiss.  Beyond arguing that there is no cognizable case or controversy, Defendant argues that Plaintiff has not stated a claim for relief under the ACPA.  Mot. 8:14-15.

Under Rule 12(b)(6), a party may move to dismiss claims based on a lack of a cognizable legal theory or lack of sufficient facts alleged under a cognizable legal theory.  <u>Balistreri</u>, 901 F.2d at 699.

Under 15 U.S.C. § 1125(d), "a party can be held liable if it registers, traffics in, or uses a 'domain name' that is 'identical or confusingly similar' to a distinctive mark . . . with bad faith intent to profit from the mark."  15 U.S.C. § 1125(d)(1)(A).  Under 15 U.S.C. § 1114(2)(D)(v), "[a] domain name registrant whose domain name has been suspended, disabled, or

transferred under a policy described under clause
(ii)(II) may . . . file a civil action to establish
that the registration or use of the domain name by such
registrant is not unlawful under this Act."  15 U.S.C.
§ 1114(2)(D)(v).  A policy described under clause
(ii)(II) is a "reasonable policy . . . prohibiting the
registration of a domain name that is identical to,
confusingly similar to, or dilutive of another's mark."
15 U.S.C. § 1114(2)(D)(ii).

    1.  <u>Definition of "Domain Name"</u>

    In order for Plaintiff to state a claim under
either 15 U.S.C. § 1125(d) or § 1114(2)(D)(v), it must
first show that a "domain name" is at issue in this
case.  Plaintiff must therefore show that the gTLD
<.delmonte> is a "domain name" and, therefore, subject
to these provisions of the ACPA.

    This appears to be a matter of first impression,
and the Court keeps in mind that "[n]ot once has any
court imputed trademark rights to a gTLD.  In fact,
rather than look *at* a gTLD to determine trademark
rights, the Ninth Circuit and others ignore the TLD as
though it were invisible next to the second level
domain name in an infringement action."  <u>Image Online
Design, Inc. v. Core Ass'n</u>, 120 F. Supp. 2d 870, 878
(C.D. Cal. 2000).

    Plaintiff asserts that the ACPA "makes no
distinction between top, second, or even third-level
domain names."  Opp'n 16:7-8.  Defendant, on the other

1  hand, notes that a TLD has never been found to be a

2  "domain name" for ACPA purposes.  Mot. 8:17-18.  The

3  parties, however, go no further in their arguments.

4  The Court must itself determine if the <.delmonte>

5  gTLD constitutes a "domain name" under the ACPA.

6      Since Congress passed the ACPA, numerous courts

7  have defined a "domain name" as consisting of "at least

8  two parts: the top level domain and the second level

9  domain." Sallen, 273 F.3d at 19; Rearden LLC, 683 F.3d

10 at 1196 n.1 (9th Cir. 2012) (quoting Office Depot Inc.

11 v. Zuccarini, 596 F.3d 696, 698-99 (9th Cir. 2010));

12 Coca-Cola Co. v. Purdy, 382 F.3d 774, 783 (8th Cir.

13 2004); Interactive Prods. Corp. v. A2z Mobile Office

14 Solutions, Inc., 326 F.3d 687, 691 (6th Cir. 2003);

15 Virtual Works, Inc. v. Volkswagen of Am., Inc., 238

16 F.3d 264, 266 (4th Cir. 2001); Sporty's Farm L.L.C. v.

17 Sportsman's Mkt., Inc., 202 F.3d 489, 492-93 (2d Cir.

18 2000); Brookfield Commc'ns v. W. Coast Entm't Corp.,

19 174 F.3d 1036, 1044 (9th Cir. 1999); see also GoForit

20 Entm't, LLC v. DigiMedia.com L.P., 750 F. Supp. 2d 712,

21 725 (N.D. Tex. 2010) (holding that a third-level domain

22 was not a domain name under the ACPA, reasoning that it

23 was never assigned or registered with a registrar, and

24 that only second and top level domain combinations were

25 domain names).

26      It follows, then, that under this definition of

27 "domain name," a TLD is merely a necessary, but not

28 sufficient, part of a "domain name."  But these

holdings are not directly on point and, accordingly, are not conclusive.  If they were, this Court's inquiry would end here.

The plain language of the ACPA is equivocal: "*any* alphanumeric designation" on the Internet that is "part of an electronic address" may be a domain name so long as it "is registered" with "a domain name registrar, domain name registry, or other domain name registration authority."  15 U.S.C. § 1127 (emphasis added).  A plain reading of this definition suggests that the <.delmonte> gTLD, as an alphanumeric designation, *can* be a domain name so long as it is registered with "a domain name registrar, domain name registry, or other domain name registration authority."  Id.

It follows, then, that answering the question of whether ICANN is a "domain name registrar, domain name registry, or domain name registration authority" is critical to determining whether a TLD is a domain name because applicants apply directly to ICANN for a new gTLD.  See Compl. ¶ 20.

"ICANN is a nonprofit corporation that was created in 1998, in response to a policy directive of the Department of Commerce, to administer the domain name system on the Department's behalf."[2]  Coalition for

---

[2] To the extent that these facts regarding ICANN's role were not presented to this Court, this Court may take judicial notice of them because they are not subject to "reasonable dispute because" they are generally known within this court's territorial

1  ICANN Transparency, Inc. v. VeriSign, Inc., 567 F.3d

2  1084, 1088 (9th Cir. 2009).

3          As part of its coordination of the domain name

4      systems, ICANN maintains a relationship with the

5      key actors in the system, including *registries*,

6      which operate top-level domains ('TLDs') such as

7      '.com' or '.org' and maintain information on all

8      domain names registered within a particular top-

9      level domain, and *registrars*, which make domain

10     names available to customers and register domain

11     names with a registry.  The customer and owner

12     of the domain name is the 'registrant.'

13  Vizer v. VIZERNEWS.COM, 869 F. Supp. 2d 75, 78 (D.D.C.

14  2012) (citing Office Depot, 596 F.3d at 699; Dotster,

15  Inc. v. Internet Corp. for Assigned Names and Numbers,

16  296 F. Supp. 2d 1159, 1160 (C.D. Cal. 2003)); see also

17  Name.Space, Inc. v. Internet Corp. for Assigned Names &

18  Nos., CV 12-8676 PA (PLAx), 2013 WL 2151478, at *1-4

19  (C.D. Cal. Mar. 4, 2013) (providing an overview of

20  ICANN's history and its role in administering the

21  Domain Name System).

22          At least with respect to its normal functions,

23  ICANN does not provide the typical services domain name

24  registries or domain name registrars provide and ICANN

25  _____

26  jurisdiction or can be accurately and readily
    determined from sources whose accuracy cannot
27  reasonably be questioned.  Fed. R. Evid. 201(b); Vizer
    v. VIZERNEWS.COM, 869 F. Supp. 2d 75, 77 n.3 (D.D.C.
28  2012).

has not been recognized as a domain name registrar or registry in the past. <u>See</u> <u>Vizer</u>, 869 F. Supp. 2d at 82. This makes sense, as ICANN's role has been to administer and coordinate these entities, not to act at the individual domain name level. Accordingly, the Court finds that ICANN is neither a "domain name registrar" nor a "domain name registry" for purposes of the ACPA.

However, this leaves open the question of whether ICANN is an "other domain name registration authority" for the purposes of the ACPA. 15 U.S.C. § 1127. If ICANN is, then a gTLD could be a domain name.

In <u>Vizer</u>, the court found that the "plain language" of the ACPA "makes clear that the phrase 'other domain name authority that registered or assigned the domain name,' covers only entities that perform the functions of the registrar and registry by registering or assigning domain names." <u>Vizer</u>, 869 F. Supp. 2d at 82. The court held that ICANN was not a "domain name authority" - or a domain name registrar or registry - in the context of § 1125(d)(2)(A).[3] <u>Id.</u> The court reasoned that "ICANN's role within the domain name system [does] not give it the 'hands-on' role in 'register[ing]' or 'assign[ing]' the defendant domain

_____

[3] However, this Court recognizes that the <u>Vizer</u> court limited its holding and explicitly stated that its holding *did not* apply to ICANN's role in approving new gTLDs. <u>Id.</u> at 83 n.7.

name sufficient to confer *in rem* jurisdiction in this Court" under the ACPA.   Id. at 83.

ACPA co-sponsor Senator Patrick Leahy's comments on the bill are illuminating: "Since registrars only register second level domain names," the definition of domain name "under current registration practice, *applies only to second level domain names*."   145 Cong. Rec. 14986, 15025 (1999) (emphasis added).   The Senate Judiciary Committee Report on the ACPA similarly opines that the definition of "domain name" "essentially covers the second-level domain names assigned by domain name registration authorities."   S. Rep. No. 106-140, at *10 (1999).   Senator Leahy further clarified that "[o]nly these entities that actually offer the challenged name, placed it in a registry, or operate the relevant registry" were intended to be covered by the terms "domain name registrar, domain name registry, or other domain name authority."   145 Cong. Rec. 14986, 15025 (1999).

In short, both the plain language of the statute and its legislative history suggest that ICANN is not a "domain name registration authority" within the meaning of the ACPA.   Such an inference implies, of course, that a gTLD such as <.delmonte> is not a domain name within the meaning of the ACPA.   If this were the case, then Plaintiff's request under 15 U.S.C. § 1114(2)(D)(v) for a declaration that it is in compliance with the ACPA must fail as the ACPA would be

1    inapplicable to this Action.

2        The difficulty, of course, is that ICANN *does* act

3    in a "hands-on" role with respect to the new gTLD

4    program.  The application process for the new gTLD

5    program is extensive, encompassing many steps before

6    ICANN finally delegates a new gTLD into the root zone.[45]

7    See gTLD Applicant Guidebook Version 2012-06-04, ICANN,

8    (June 4, 2012),

9    http://newgtlds.icann.org/en/applicants/agb/guidebook-f

10   ull-04jun12-en.pdf.[6]  ICANN's extensive involvement in

11   _____

12       [4] These facts regarding ICANN's new gTLD
     application process are judicially noticeable because
13   they are not subject to reasonable dispute and are
     capable of accurate and ready determination by resort
14   to sources whose accuracy cannot reasonably be
     questioned.  Fed. R. Evid. 201; Lee v. City of Los
15   Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).  The
     Court notes that Plaintiff does not appear to contest
16   their authenticity as Plaintiff cites to the same
     website.  See Opp'n 17:20-18:2.
17
         [5] The "root zone" is a database that "represents
18   the delegation details of top-level domains, including
     gTLDs and ccTLDs."  New Generic Top-Level Domains
19   Glossary: Terms Applicable to the Application Process,
     at 6, ICANN, (Aug. 30, 2011),
20   http://archive.icann.org/en/topics/new-gtlds/glossary-3
     0aug11-en.pdf.  "Delegation" refers to "[t]he process
21   through which the root zone is edited to include a new
     TLD, and the management of domain name registrations
22   under such TLD is turned over to the registry
     operator."  Id. at 2.
23
         [6] ICANN's new gTLD application process allows
24   potential applicants to submit applications for new
     gTLDs during a four month period.  Id. at 1-2, 1-3.
25   After the submission window closes, ICANN checks each

26

27

28

the new gTLD program is quite different from its role
application for completeness.  <u>Id.</u> at 1-5.  Each
application requires a $185,000 evaluation fee.  <u>Id.</u> at
1-42.  After new gTLD applications are publicly posted
on ICANN's website, ICANN opens a Comment Period and
comments received within 60 days of the application
posting are considered by evaluators.  <u>Id.</u> at 1-5, 1-6.
After the completeness check, ICANN begins an Initial
Evaluation, consisting of a "String review" and
"Applicant review."  <u>Id.</u> at 1-8, 1-9.  "String reviews"
consider whether the applied for gTLD string will cause
security or stability problems; "Applicant reviews"
consider whether an "applicant has the requisite
technical, operational, and financial capabilities to
operate a registry."  <u>Id.</u> at 1-9.  Certain applicants
that fail the Initial Evaluation may request an
Extended Evaluation wherein the applicant and
evaluators exchange additional information to clarify
information in the application.  <u>Id.</u> at 1-11.  ICANN's
application process also allows for third parties to
file formal objections during the Objection Filing
Period.  <u>Id.</u> at 1-10.  The application process also
includes a Dispute Resolution period.  <u>Id.</u> at 1-12.  If
a formal objection is filed against an application,
independent dispute resolution service providers
initiate and conclude proceedings based on the
objections received.  <u>Id.</u>

    If there is more than one qualified application for
an identical or similar gTLD string, a "String
Contention" case arises.  <u>Id.</u> at 1-13.  Such cases are
resolved either through a community priority evaluation
or through an auction.  <u>Id.</u>  Finally, applicants who
have successfully completed all relevant stages of the
application process must complete several additional
steps, including the execution of a registry agreement
with ICANN and the completion of a technical test,
before ICANN delegates the new gTLD into the root zone.
<u>Id.</u> at 1-14, 1-15.  Furthermore, ICANN's involvement
with successful applicants is ongoing; even after
delegation, ICANN performs regular audits to ensure
gTLD registry operators' compliance with their
agreement obligations.  <u>Id.</u> at 5-15.

in administering the Domain Name System.  By receiving
and reviewing applications for new gTLDs and by
ultimately delegating new gTLDs into the root zone,
ICANN acts much like a traditional domain name
registrar.  And by performing regular audits and in
delegating new gTLDs into the root zone, ICANN acts
much like a traditional domain name registry.  Even so,
given the limited and circumscribed nature of the new
gTLD program, construing ICANN as a "domain name
registration authority" seems akin to cramming a square
peg into a round hole.

It appears, then, that the Court must turn to the
other elements of Plaintiff's claim under the ACPA.
For this purpose, this Court assumes, without deciding,
that the <.delmonte> gTLD is a "domain name."

2.   <u>15 U.S.C. §§ 1114(2)(D)(v) and 1125(d)</u>

In order to show liability for cybersquatting under
§ 1125(d), a plaintiff must show that "(1) the
defendant *registered, trafficked in, or used* a domain
name; (2) the domain name is identical or confusingly
similar to a protected mark owned by the plaintiff; and
(3) the defendant acted 'with bad faith intent to
profit from that mark.'"  <u>Rearden LLC</u>, 683 F.3d at 1219
(emphasis added) (quoting <u>DSPT Intern., Inc. v. Nahum</u>,
624 F.3d 1213, 1218-19 (9th Cir. 2010)); <u>see</u> <u>also</u>
<u>GoPets Ltd. v. Hise</u>, 657 F.3d 1027, 1030 (9th Cir.
2011).

15 U.S.C. § 1114(2)(D)(v), on the other hand,

1  provides a cause of action for reverse domain name
2  hijacking.  See Hawes v. Network Solutions, Inc., 337
3  F.3d 377, 383 (4th Cir. 2003); Barcelona.com, Inc., 330
4  F.3d at 625; Ricks v. BMEzine.com, LLC, 727 F. Supp. 2d
5  936, 959 (D. Nev. 2010).  To prevail on such a claim,
6  Plaintiff must show

7      (1) that it is a domain name registrant; (2)
8      that its domain name was *suspended, disabled, or*
9      *transferred* under a policy established by a
10     registrar as described in 15 U.S.C. §
11     1114(2)(D)(ii)(II); (3) that the owner of the
12     mark that prompted the domain name to be
13     suspended, disabled, or transferred has notice
14     of the action by service or otherwise; and (4)
15     that the plaintiff's registration or use of the
16     domain name is not unlawful under [this
17     chapter].

18 Barcelona, Inc., 330 F.3d at 626 (emphasis added); see
19 also Ricks, 727 F. Supp. 2d at 960 (holding that the
20 words "this chapter" in § 1114(2)(D)(v) refers only to
21 the ACPA, not the whole Lanham Act).  In other words, §
22 1114(2)(D)(v) covers situations in which a domain name
23 registrant has been found to be a cybersquatter by an
24 administrative panel of a registrar, registry, or other
25 domain name authority.  See Sallen, 273 F.3d at 28.
26 Furthermore, because § 1114(2)(D)(v) requires a court
27 to determine whether a party is in compliance with §
28 1125(d), (see Sallen, 273 F.3d at 18; Ricks, 727 F.

Supp. 2d at 960), it follows that § 1114(2)(D)(v) can apply *only if* the Plaintiff's actions could also be subject to § 1125(d) liability.  See <u>AIRFX.com v. AIRFX LLC</u>, No. 11-01064-PHX-FJM, 2012 WL 3638721, at *6 (D. Ariz. Aug. 24, 2012) ("Because we have concluded that plaintiffs cannot be liable under the ACPA for cybersquatting as a matter of law . . . we conclude that there is no genuine issue of fact as to whether plaintiffs' use of the domain name is lawful").

The ACPA does not provide a definition of "register."  See <u>GoPets</u>, 657 F.3d at 1030.  Faced with this issue, the <u>Vizer</u> court found that registering a "domain name" under the ACPA includes entering into a contractual relationship with a registrar to "make a record" of the requested domain name.  See <u>Vizer</u>, 869 F. Supp. 2d at 81-82.  In other words, "registration" under the ACPA at least requires the registrant to enter into a contract to have its proposed domain name entered into the appropriate registry.  See <u>also</u> <u>GoPets</u>, 657 F.3d at 1030 ("It is obvious that, under any reasonable definition, the initial contract with the registrar constitutes a 'registration' under ACPA").  A typical domain name registration is essentially automatic: "[r]egistrars accept registrations for new or expiring domain names, connect to the appropriate registry operator's TLD servers to determine whether the name is available, and register available domain names on behalf of registrants."

1  <u>Coalition for ICANN Transparency Inc. v. VeriSign,</u>
2  <u>Inc.</u>, 464 F. Supp. 2d 948, 952 (N.D. Cal. 2006).
3      The Court finds that Plaintiff has not "registered"
4  the <.delmonte> gTLD.  Plaintiff alleges that it
5  entered into a contract with ICANN by submitting its
6  application for the <.delmonte> gTLD.  Compl. ¶ 25.
7  But even so, ICANN never "made a record of" the
8  <.delmonte> gTLD in the root zone because it sustained
9  Defendant's LRO.  <u>Id.</u> at ¶ 36.  "[R]egistration" in the
10 gTLD context requires ICANN to actually delegate
11 <.delmonte> into the root zone and thereby make a
12 record of the domain into the Domain Name System.  <u>Cf.</u>
13 <u>GoForIt Entm't</u>, 750 F. Supp. 2d at 723 (holding that
14 third level domain names are not covered by the ACPA
15 because they are not registered or assigned by a domain
16 name registrar).  No such event occurred here as
17 Defendant's LRO successfully prevented ICANN from
18 delegating <.delmonte>.  Compl. ¶ 36.  Unlike the
19 mechanical second level registration system, the gTLD
20 application process does not immediately and
21 automatically delegate a gTLD into the root zone upon
22 application.  <u>See gTLD Applicant Guidebook</u>, at 1-48, 1-
23 49.  Instead, an application must survive several
24 discrete steps, including any filed objections, in
25 order to reach the delegation stage.  <u>Id.</u>
26      Plaintiff avers, however, that "[i]t is of no
27 moment that the application and registration occur
28 simultaneously for a second-level domain name, and

separately for a TLD" because "[i]n both cases a WIPO Panel is called upon to determine whether the registration is, or was, appropriate."  Opp'n 16:11-15.

Plaintiff's argument misses a crucial point.  It is precisely because application and registration occur simultaneously for second level domains that the ACPA is necessary.  Once an available domain name is applied for and registered, all other potential applicants are barred from using that domain.  No advance notice is given.  Thus, the UDRP and 15 U.S.C. § 1125(d) exist to dissuade the unscrupulous use of another's mark.  That trademark owners may be excessively vigilant in protecting their marks is an outgrowth of such a system of instantaneous registration and mutual exclusion.  15 U.S.C. § 1114(2)(D)(v), meant to counteract "reverse domain name hijacking," exists to prevent overreaching by overzealous trademark owners.

In contrast, the gTLD application process deliberately separates application from registration. By doing so, the process is designed to stymie cybersquatting activity.  In order to do so, the gTLD process introduces high entry costs in the form of its hefty evaluation fee and extensive initial review process.  Moreover, the extensive evaluation process, with its provision for transparency for interested stakeholders, further protects against the potentiality of successful cybersquatting behavior.  Such barriers present serious challenges to typical cybersquatting

activity.  As a result, the protections of the ACPA are much less relevant to the gTLD application process than for the current second level domain name registration process.

The Court also finds that Plaintiff has not "trafficked in" or "used" the <.delmonte> gTLD to give rise to ACPA liability.  A party may be liable for cybersquatting if he "traffics in" an offending domain name.  15 U.S.C. § 1125(d)(1)(A)(ii).  To "traffic" is to engage in "transactions that include . . . sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration."  15 U.S.C. § 1125(d)(1)(E).  It follows that Plaintiff could not have "trafficked in" the <.delmonte> gTLD without a "registration" as without ICANN's delegation of the <.delmonte> gTLD, Plaintiff had nothing to transfer for consideration.  Simply put, Plaintiff cannot transfer something that does not exist.  The same holds true for whether Plaintiff "used" the <.delmonte> gTLD.  While the definition of "use" under the ACPA may be broad, (see DSPT Int'l, 624 F.3d at 1219 (holding that a defendant used a domain name by changing its contents to obtain leverage in his claim for commissions)), the Court finds that there must still be a registered domain name in order for there to be liability for "use" of that domain name.  Because the <.delmonte> gTLD was never delegated, it follows that Plaintiff

33

could not have "used" <.delmonte> in any manner.

Accordingly, because Plaintiff has not pleaded sufficient facts to show that it "registered, trafficked in, or used a domain name," the Court finds that Plaintiff has failed to make out a prima facie case for cybersquatting under 15 U.S.C. § 1125(d). Rearden LLC, 683 F.3d at 1219. Because the Court finds that Plaintiff cannot be liable under the ACPA as a matter of law, the Court finds that § 1114(2)(D)(v) similarly is inapplicable to this Action. As such, the Court finds that Plaintiff has failed to state a claim upon which relief may be granted.

The Court recognizes the paradoxical nature of this result - second level domain disputes adjudicated under the UDRP could be subject to review under the ACPA but disputes over top level domains may not. However, this Court believes that extending the ACPA to cover such disputes would upset the balance reached by ICANN in formulating its new gTLD program. This Court is convinced that dismissal is warranted given the precautions set forth within ICANN's new gTLD application process and the stark contrast between that application process and the second level domain registration system. Moreover, the Court cautions that this holding does not necessarily foreclose application of the ACPA in the context of successful gTLD registrations. The Court agrees with Defendant that owning a gTLD "carries with it a far stronger public

association of brand ownership than any domain name registration." Reply 7:15-17. The need for judicial review in the context of a successful gTLD application therefore is much more significant than in the context of an unsuccessful application.

Finally, this Court agrees with Defendant that accepting Plaintiff's construction of § 1114(2)(D)(v) would render an attempt to register a domain name actionable under the ACPA. See Mot. 8:20-24. Reading "registration" to encompass the gTLD application process would make actionable instances where individuals entered into contracts with registrars to register an infringing domain name but were ultimately unsuccessful in obtaining that domain name. Such a reading of the ACPA is incongruent with the rest of the statute. Furthermore, the Court believes that such a reading would broaden the scope of the ACPA beyond that contemplated by Congress or supported by the case law.

3. Requests for Declaratory Relief

It is well established that the Declaratory Judgment Act "does not create an independent cause of action." Chevron Corp. v. Camacho Naranjo, 667 F.3d 232, 244-45 (2d Cir. 2012) (quoting Davis v. United States, 499 F.3d 590, 594 (6th Cir. 2007)). As such, this Court need not separately determine if Plaintiff has adequately pleaded a claim under the Declaratory Judgment Act.

//

35

4. <u>Conclusion</u>

The Court finds that the ACPA is inapplicable to this Action because even if the Court had found that <.delmonte> was a domain name, Plaintiff has still failed to plead a cognizable theory under the ACPA because <.delmonte> was never registered, transferred, or used.   The Court notes that Plaintiff has not pleaded any other claims because the Declaratory Judgment Act does not create an independent cause of action.   Accordingly, the Court hereby **GRANTS** Defendant's Motion to Dismiss Plaintiff's Complaint [17].   Furthermore, because the facts of this Action ultimately revolve around Plaintiff's application for the gTLD <.delmonte>, the Court hereby dismisses without leave to amend as Plaintiff cannot allege any facts sufficient to cure its cause of action.   <u>See</u> <u>Lopez v. Smith</u>, 203 F.3d at 1130.

//

//

### IV.   Conclusion

For the foregoing reasons, the Court hereby **GRANTS** Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [17].  The Court hereby dismisses this case without leave to amend.  The Clerk shall close this action.

**IT IS SO ORDERED.**

DATED: February 5, 2014

RONALD S.W. LEW

**HONORABLE RONALD S.W. LEW**
Senior, U.S. District Court Judge